IN THE UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

|  |  |  |
|---|---|---|
| Ron Ely, | : | |
| | : | No.: 2:20-cv-06549 DMG (SKx) |
| Plaintiff, | : | |
| vs. | : | |
| County of Santa Barbara, *et al.*, | : | Report of Kenneth R. Wallentine |
| Defendants. | : | |

The following report of Kenneth R. Wallentine is submitted after reviewing the following documents, pleadings, records, and reports:

Plaintiff's 1st Amended Complaint

Defendants' Answer

Defendants' Initial Disclosures & Exhibits

Plaintiff's Initial Disclosures & Exhibits

Plaintiff's Expert Disclosures

Incident Report No. 19-13833 and associated evidence forms

Scene and involved deputy photographs

Cameron Ely Coroner's Report, forensic testing, and photographs

Valerie Ely Coroner's Report and photographs

Deposition transcripts of Daniel Pritchett, John Gruttadaurio, Philip Farley, Desiree Thome, and Jeremy Rogers

Audio recordings of interviews of John Gruttadaurio, Philip Farley, Desiree Thome, Ron Ely, Kirsten Ely, Kaitland Ely Sweet & Jason Sweet, Frank Mendez, Christopher Brady, Brian Talbott, Damien Manuele, Daniel Pritchett, and Taylor Parks

Audio recordings of 911 calls and dispatch radio broadcasts

Philip Farley's body camera and patrol car video recordings, Desiree Thome's patrol car video recording, Jeremy Rogers's patrol car video recording, John Gruttadaurio's patrol car video recording, Thomas Brownlee's patrol car video recording, and Christopher Brady's patrol car video recording

Training records for John Gruttadaurio, Philip Farley, Desiree Thome, and Jeremy Rogers

Santa Barbara County Sheriff's Office policy manual excerpts

Santa Barbara County Sheriff's Office Use of Deadly Force Review Board Findings (Berg, George, and Ely)

Performance records for John Gruttadaurio, Philip Farley, Desiree Thome, and Jeremy Rogers

Dept. of Justice Forensic Services Evidence Examination Report

Santa Barbara County Sheriff's Office Forensics Reports

Serological Research Institute Report


Kenneth R. Wallentine states as follows:

1.      In the instant matter, I have relied upon the documents, pleadings, records, reports, and statements previously described.  I have formed a number of opinions based upon the aforementioned, as well as my experience, education and familiarity with professional standards, practices, and publications.  I have relied on a variety of professional publications, including, but not limited to, my own publications and court decisions cited therein.  I have considered various statements and accounts that may be in conflict one with another and considered factors such as the time at which the statement was made, the interests of the party making the statement, the vantage and view opportunities and perceptive abilities and consistency or inconsistency with the physical evidence, and evidence of any possible impaired cognition, and the collective statements of other witnesses.  My opinions, and a summary of the circumstances known or reported to me upon which those opinions are based, are set forth herein as follows.

**Abbreviated synopsis of reported events:**

On the evening of Tuesday, October 15, 2019, at approximately 2015 hours, Cameron Ely called 911 to report an alleged domestic altercation at the Ely family home at 4141 Mariposa Drive in the Hope Ranch area of Santa Barbara.   Cameron Ely told the dispatcher, "Uh please hurry. ...  My mother tried to attack my father and I defended him."  Before the connection was broken, Cameron Ely could be heard in the background muttering an unintelligible phrase.[1]  One minute later, the dispatcher called back and a male later identified as Ron Ely ("Plaintiff") answered the phone.  Cameron Ely was heard saying, "Pop, okay.  Okay.  Pop you can say, they're there."  Plaintiff cannot be understood, presumably due to having previously suffered a stroke.  The dispatcher tried to gather more information about what is occurring or has occurred but Plaintiff could only be heard mumbling unintelligibly.

Santa Barbara County Sheriffs' Office ("SBSO") Deputy John Gruttadaurio was dispatched to the call.  Senior Deputy Jeremy Rogers, and Deputy Phillip Farley told the dispatcher that they would assist with the call.  The deputies were all wearing standard SBSO uniforms with SBSO patches, Deputy Sheriff badges, radios, and other police equipment. Deputy Farley and Sergeant Desiree Thome[2] each wore caps with Sheriff identification featured prominently.  They were all driving marked Sheriff's patrol vehicles.  When he arrived, Senior Deputy Rogers looked through a window and saw a bottle of Resolve carpet cleaner, and Plaintiff seated in a wheelchair inside the house.  When the deputies knocked on the front door, they could hear moaning inside.  Deputies Farley and Gruttadaurio pushed open the door and saw Plaintiff in his wheelchair, seated in the dining room.

Deputy Gruttadaurio walked past Plaintiff to the left.  He saw a woman –subsequently identified as Valerie Ely– on the floor with her shirt pulled up above her chest, several stab wounds to her chest, her viscera extruding from her belly, and a knife impaled in her chest.

---

[1]  Cameron Ely seems to have said: "Mahabone," a "secret" word believed to be used in Masonic rituals.

[2]  Sergeant Thome arrived sometime after the first three deputies.

Based on his training and experience as a Deputy Sheriff he discerned that Valerie Ely was obviously deceased based on the extent of her injuries, the pale color of her skin, and her eyes being fixed open. Moments later, Senior Deputy Rogers knelt at Valerie Ely's side, checked for a pulse but found none. He, too, observed that Ms. Ely's eyes were fixed and open.

The deputies notified dispatch of the apparent homicide of Valerie Ely, thereby alerting investigative and supervisory personnel. Senior Deputy Rogers wheeled Plaintiff out the front door of the residence, called for medical assistance, and remained with Plaintiff until medics arrived to care for him. Deputies Christopher Brady, Thomas Brownlee, and Bruno Bertuzzi responded to assist. Sergeant Desiree Thome responded as the area supervisor. Deputy Farley and his police service dog were joined by Deputies Brady, Brownlee, Bertuzzi and Gruttadaurio, in making a protective sweep of the interior of the main house. They found no one else in the house, though they did close an open door leading to the back yard from a western bedroom. The deputies then walked around the east side of the main house into the expansive back yard. They made a protective sweep of the guest house, finding no one there. Once they completed the protective sweep Deputy Farley turned off his body worn camera.

The deputies saw that one of the garage doors was open. Deputy Farley noticed that there was an open stall in the garage and he broadcast that information. One of the gates to the street was open, suggesting that a car had been driven out of the garage and away from the house. The deputies began to check records for vehicles registered to the house so that they could further assess whether a vehicle was missing.

Senior Deputy Rogers had a limited conversation with Plaintiff as they waited for the paramedics. Senior Deputy Rogers posed "yes" and "no" questions to Plaintiff and Plaintiff responded with head nods. Interpreting Plaintiff's responses and gleaning additional information from dispatch Senior Deputy Rogers identified Cameron Ely as the probable suspect in Valerie Ely's murder. Deputies began to mark the area with crime scene tape and started a crime scene log. Once paramedics arrived, they took Plaintiff to the Santa Barbara Cottage hospital. Deputy Bertuzzi accompanied Plaintiff to the hospital.

The deputies received information from dispatch about the vehicles that were registered at 4141 Mariposa Drive.  They began comparing the vehicle registration list with the license plates of cars at the residence.  Sergeant Thome directed Deputy Gruttadaurio and Deputy Farley to go to the rear of the property to check the license plate on a vehicle parked there and covered by a tarpaulin.  Well over an hour had passed from the time that the deputies first arrived at the house.  The deputies believed that the murder suspect had fled and was no longer on the premises.

Deputy Farley and Deputy Gruttadaurio began to walk to the east side of the house, then to the south and back toward the covered vehicle.  As they turned the corner, they saw a man walking towards them on the driveway, from the south.  It was dark and only the deputies' flashlights provided any illumination.  The deputies believed that this was the murder suspect subsequently identified as Cameron Ely.  A flannel shirt covered his waistband.

Deputy Farley drew his handgun and commanded Cameron Ely to get on the ground. Deputy Gruttadaurio called out "we need more units."  Deputy Gruttadaurio also commanded Cameron Ely to "get on the ground" several times.  Cameron Ely did not say anything in response but sat down on the ground and then laid down on his back.  He was supine, with his head oriented toward Deputy Farley and Deputy Gruttadaurio, with his feet pointed away from them.  Deputy Farley described the Cameron Ely's position as placing his arms out to the sides "like an airplane" on the ground, with his knees bent above the ground.  Deputy Farley saw what appeared to be a three to four inch lateral knife wound on Cameron Ely's neck.

Deputy Farley radioed for medical assistance to attend to the knife wound.  He holstered his weapon and moved closer to Cameron Ely intending to render aid for the knife wound.  He moved within one to two feet, just behind the suspect's left shoulder.  Deputy Gruttadaurio moved to the right of Cameron Ely.  Deputy Farley and Deputy Gruttadaurio told Cameron Ely to "show me your hands" and "roll over to your stomach."

Senior Deputy Rogers and Sergeant Thome heard the other deputies shouting commands to someone to get on the ground and ran to their location.  As Senior Deputy Rogers and

Sergeant Thome reached Deputies Farley and Gruttadaurio, Sergeant Thome described Cameron Ely's actions as "moving his body jerkily," "changing his hand position between slapping both hands on the ground, to covering his face." Sergeant Thome saw that he was "rocking back and forth . . . was bending and straightening his legs, acting like he was in some sort of mental frustration or tantrum," "moaning, covering his face, stomping his feet, spasming his legs but not following his instructions." Sergeant Thome stood near Deputy Farley and Senior Deputy Rogers stood near to Deputy Gruttadaurio.

Sergeant Thome noted something heavy in Cameron Ely's left pants pocket that seemed to weigh down the pocket to the pavement. Deputy Gruttadaurio noted that all of Cameron Ely's movements to that point had been slow and his "demeanor was like a zombie." It was dark, with only the deputies' flashlights providing any illumination.

Suddenly, Cameron Ely cried out in a load voice, "I have a gun," raising his inflection at the end. As he yelled, Cameron Ely brought his hands into his body near his waistband, sitting up quickly, and moving his left hand into his waistband. Deputy Farley perceived that Cameron Ely was drawing a gun to shoot him and the other deputies. Senior Deputy Rogers saw Cameron Ely rise up and also heard the loud exclamation, "I have a gun" in a "warning, taunting, threatening manner" as he rose up "like a runner out of the gate," "more forward than upward, like a lineman in a football game, right towards me, and lunged forward toward the officers."[3] Senior Deputy Rogers also perceived that Cameron Ely was about to shoot him and the other deputies. Sergeant Thome heard "I have a gun," as she saw Cameron Ely "pop up in a flurry of clothing," cock his elbow back, as she saw a "glint of something reflective in the area of his right hip." She, too, interpreted his action as a threatening move to draw a gun. Deputy Gruttadaurio heard Cameron Ely exclaim "I have a gun" as Deputy Gruttadaurio saw him reach across his body to his waistband.

---

[3] Cameron Ely was, in fact, an accomplished and much-lauded football quarterback.

Deputy Farley drew his handgun and fired three shots at Cameron Ely as he backed away from Ely.  Simultaneously, or perhaps nearly simultaneously, Deputy Gruttadaurio fired his handgun at Cameron Ely and walked backwards toward a planter, which he knelt behind as some cover.  Senior Deputy Rogers, then standing nearly shoulder to shoulder with Deputy Gruttadaurio, also fired his handgun at Cameron Ely.  Sergeant Thome fired her handgun at Cameron Ely and moved to cover at the corner of the house.

As he lay on the pavement, Cameron Ely moved his right hand, which was underneath his right side towards his waistline.  Senior Deputy Rogers saw something shiny near Cameron Ely's right pocket reflecting light and believed that it was a weapon.  Deputy Gruttadaurio gave several commands to him to slowly remove his right hand from under his stomach.  Though Cameron Ely was moving and making some noises, he did not remove his right hand as commanded.

Sergeant Thome called for a ballistic shield to protect the deputies as they approached Cameron Ely to check for weapons and attend to his injuries.[4]  Once Deputy Brownlee brought the ballistic shield from Sergeant Thome's patrol vehicle, the deputies approached Cameron Ely, secured and searched him, and called for the waiting paramedics to attend to him.  Santa Barbara County Fire Paramedics attended to Cameron Ely, subsequently pronouncing him dead at the scene.

---

[4]  A ballistic shield is a protection device to enhance safety in a tactical approach.  A ballistic shield is designed to stop or deflect bullets and other projectiles missiles thrown or fired at the deputy.  The deputies used a common hand-carried ballistic shield in this incident.

*Ely v. County of Santa Barbara, et al.*
*Report of Kenneth R. Wallentine*

**Discussion and opinions:**

a.    **The Santa Barbara County Sheriff's deputies' response to the disturbance call was consistent with generally accepted police training and practices.**

1.    A call for service related to an unknown domestic disturbance would typically warrant a response by two or more deputies when possible.  Commonly accepted police practices would include communication to coordinate approach so that at least two deputies made the initial contact at the residence.

2.    A reasonable and well-trained deputy provided with the information available to Deputy Gruttadaurio and the other deputies would perceive that they were responding to a relatively common domestic disturbance call.  Consistent with common police practices Deputy Gruttadaurio waited for assisting deputies to approach the house.  Upon their initial approach the deputies knocked to make a consensual entry.

3.    Deputy Gruttadaurio knocked and received no reply.  However, he could hear unintelligible moaning inside the house.  Senior Deputy Rogers looked through a window and saw a bottle of Resolve carpet cleaner, and Plaintiff seated in a wheelchair inside the house.  A reasonable and well-trained deputy, acting consistently with generally accepted police practices, would have concluded that Plaintiff needed assistance and was unable to come to the door, and would have entered the house.  Deputies Farley and Gruttadaurio pushed open the door and they, too, then saw Plaintiff seated in his wheelchair, trying to move the chair to the front door.

4.    Deputy Gruttadaurio saw Valerie Ely on the floor.   He observed that her shirt was pulled up, exposing her chest and multiple laceration and stab wounds to her chest.  Her viscera extruded well outside her stomach area.  She had a knife buried deep in her chest, inserted all the way to the handle of the knife.  It was obvious to Deputy Gruttadaurio that she was not breathing and that her eyes were glazed

over.  Based on his training and experience as a Deputy Sheriff he discerned that Valerie Ely was obviously deceased based on the extent of her injuries, the pale color of her skin, and her eyes being fixed open.  Senior Deputy Rogers testified that "almost immediately after walking in through the door and seeing her," he knelt down at Valerie Ely's side examining her more closely and checking for a pulse.  She had no pulse.  Senior Deputy Rogers saw that Ms. Ely's eyes were fixed and open.

5.      Deputy Gruttadaurio and Senior Deputy Rogers concluded that Valerie Ely was deceased.  Deputy Farley reached the same conclusion, noting that "I've seen enough dead bodies to know a dead body when I see one and she was –she was deceased."  A reasonable and well-trained deputy, particularly a deputy with previous experience with dead persons, could have determined that Ms. Ely was dead as a result of being slashed, stabbed, eviscerated, and having a knife buried in her chest.[5]

6.      Consistent with generally accepted police practices, the deputies (supported by Deputy Farley's police service dog) conducted protective sweeps of the house, the garage, and the guest house.  Finding no one else in the house, and having initial information pointing toward Cameron Ely as the murderer, the deputies returned to the front of the house to meet with the arriving supervisor, technicians, and detectives, as they shifted their focus and activities to preserving the crime scene, and assisting with the investigation into Valerie Ely's murder.

7.      After the deputies conducted a protective sweep of the house and the guest house and found no other persons in the houses, Deputy Farley deactivated his body worn camera.  He was the only one of the deputies equipped with a body worn camera.  At that point, the deputies had begun to focus on the missing son,

---

[5]  Other knives, apparently kitchen knives, were found in the cushions of a love seat, in a night stand drawer, and near the tennis court.

Cameron Ely, as the murderer, and several facts suggested that he had fled from the house.  Believing that the activity was shifting from urgent response to a crime scene investigation, it was reasonable for Deputy Farley to deactivate his body worn camera.

b.   **The deputies' response to Cameron Ely was reasonable and was consistent with generally accepted police policies, practices, and training.**

1.   Deputy Farley and Deputy Gruttadaurio were on their way to the east side of the house to investigate the covered vehicle at the side of the garage, intending to further pursue the assessment of which vehicles might be missing from the house in order to broadcast a BOLO ("be on the look out") for the vehicle possibly driven away from the scene by the murderer.  Using vehicle registration records to identify vehicles registered to persons connected to that address to assess whether a vehicle was missing was a reasonable investigative step and is consistent with common investigative practice.

2.   Based on the limited information that could be collated from the initial call to dispatch (a male speaking about a domestic dispute between his mother and father) and the information gleaned by Senior Deputy Rogers from asking "yes" and "no" questions to Plaintiff, it was reasonable to identify Cameron Ely as the probable suspect in the murder.  The deputies also knew that one of the garage doors was open, that there was an open stall in the garage, and a gate to the street was open, suggesting that someone –most likely the murderer– had driven away from the house.  Reasonable and well-trained deputies could have concluded that the suspect, most likely Cameron Ely, had fled from the scene.

3.   In fact, Cameron Ely was likely somewhere hidden on the property.  As they walked down the east side drive, Deputy Farley and Deputy Gruttadaurio did not expect to see him approach them.  Cameron Ely walked and moved in a slow fashion.  He made unintelligible noises, described by Deputy Gruttadaurio as "just

noises or moans." Deputy Farley drew his handgun and commanded Cameron Ely to get on the ground. Deputy Gruttadaurio also drew his handgun. He called out "we need more units," and also told Cameron Ely to get on the ground several times. Deputies Farley and Gruttadaurio also told him to "show me your hands" and "roll over to your stomach." Deputy Farley saw what appeared to be a three to four inch lateral knife wound on Cameron Ely's neck. When Deputy Farley saw the apparent laceration on Cameron Ely's neck, Deputy Farley thought to provide aid for him, and he moved closer to him. Reasonable and well-trained deputies, having been surprised by the sudden and unexpected appearance of a man walking toward them at a murder scene, would have ordered the man to the ground and given directions to control his movements. A reasonable and well-trained deputy would have taken steps to more closely assess the laceration and provide aid.

4.      Cameron Ely did not say anything in response to Deputy Farley and Deputy Gruttadaurio. He complied with the direction to get on the ground, slowly extending his hands, seating himself and then laying nearly fully supine with his knees bent, his head oriented toward the deputies. Deputy Farley was concerned by Cameron Ely's near proximity, stating, "I thought I had fallen into a trap and that he was going to ambush me. That he waited for me to get into close proximity, and that once I was in close proximity, he was going to reach for a gun to shoot me, because of the threat that he made combined with the movement that he made." Senior Deputy Rogers described Cameron Ely as "too close" just before Ely lunged forward at the deputies. Sergeant Thome described the distance from Cameron Ely to the deputies at the point that he rose up and charged forward: "we were way to close for comfort."

5.      A common component of police training discussing distance and threat assessment is referred to as the "21-foot principle."[6]  Deputies are commonly taught at academy basic training programs that they should draw a handgun and prepare to defend themselves when an assailant is threatening use of a blunt weapon or edged weapon within 30 feet, assuming no intervening barrier, and a suspect's apparent ability to move.  The majority of such instruction courses include a scenario known as the Tueller Drill.[7]  In this scenario, a deputy-in-training is presented with a role-playing suspect poised 21 feet from the deputy and holding a knife.  The role-playing suspect is scripted to advance, while the deputy remains in place and defends herself or himself from a knife attack.

6.      Controlled trials have shown that a suspect standing nine feet from an officer can charge at the officer and be close enough to reach out and slash the officer with an standard blade edged weapon in just over one-half of a second.  Starting just five feet away, a determined forward-moving assailant can stab and/or slash an officer with his extended arm in one-third of one second.  Dysterheft, J.L., Lewinski, W.J., Seefeldt, D.A., Pettitt, R.W., 2013, *The influence of start position, initial step type, and use of a focal point on sprinting*, Int. J. Exerc. Sci. 6 (4).  These findings are consistent with my own observations gleaned from having

[6]  Some recent literature present criticism of the 21-foot principle, sometimes falsely presenting it as a "rule" for deputies and officers.  I concur that certain applications of the 21-foot principle have been rightfully critiqued in law enforcement training circles.  The precepts of movement and physics incorporated into the 21-foot principle and applied as human factors critical to threat assessment and response, however, remain vitally instructive.

[7]  Deputies are often presented with research initially conducted at the Salt Lake City Police Department in 1984 and published by Dennis Tueller.  I participated in some of the early work and have collaborated and personally demonstrated and taught the derivative principles with Dennis Tueller on many occasions over the past thirty years.  This research shows that an assailant armed with a short-handle edged weapon standing 21 feet from a deputy is able to stab and/or slice the deputy with the edged weapon before the deputy is able to draw and fire his or her handgun more than 50% of the time and that even those deputies who are able to fire are still very likely to be stabbed or sliced.  Consequently, deputies are repetitively taught that they should draw their weapons and be prepared to defend themselves from an edged or blunt impact weapon well before an assailant closes to a 21-foot distance.  Deputies are taught to prepare to defend themselves when an assailant closes to a 30-foot distance.

administered the Tueller Drill with several hundred deputies, troopers, wildlife officers, and police officers, including nearly two hundred trials in a timed and controlled testing environment.

7.     The deputies could not safely turn their backs and retreat from Cameron Ely. Moving backward would have required moving blindly, not being able to see potentially increasing threats, particularly in the darkness surrounding them. Deputies facing an advancing assailant and backing away to create distance are at a distinct, profound, and potentially fatal speed and spatial disadvantage.  In sharp contrast to an advancing assailant, a deputy back-pedaling from a starting position (as a deputy typically does in trying to escape an attack), has an average first step backward of just barely two feet and does not accomplish a backward stride of three feet even after six strides.  Those measured distances reflect backward movement on even and flat floors in a gymnasium with a high coefficient of friction, not on uneven and/or pebbled surfaces such as asphalt.  Dysterheft, J.L., Lewinski, W.J., Seefeldt, D.A., Pettitt, R.W., 2013, *The influence of start position, initial step type, and use of a focal point on sprinting*, Int. J. Exerc. Sci. 6 (4).  The deputy has the additional disadvantage of carrying an average external load of approximately 19 pounds, further slowing the deputy.  W.J. Lewinski, J.L. Dysterheft, N.D. Dicks, R.W. Pettitt, *The influence of officer equipment and protection on short sprinting performance*, Applied Ergonomics 47 (2015) (duty gear and protective equipment on a deputy's body weighing more than 10% body mass may result in severe detriments to running).

8.     Though Cameron Ely affirmatively exclaimed that he had a gun, the threat level to the deputies from even a gun or knife or club would be deadly at that range.  It was reasonable for the deputies to believe Cameron Ely's claim to be armed with a gun.  His actions were consistent with his claim to have a gun.  A well-trained and reasonable deputy would recognize Cameron Ely's rapid movement of his

hand toward his waist as a threatening, pre-assault pattern of movement performed by a suspect about to draw a gun from the location where handguns are most commonly carried: the waist area.  Cameron Ely's rapid hand movement, consistent with drawing a gun, created an event of extreme time compression.

9.      In the critical milliseconds of conflict a deputy must use pattern recognition to predict the suspect's next move in the tense, uncertain, and rapidly-evolving circumstances in which the deputy is immersed.  Modern human experience is replete with examples of pattern recognition as a foundation for perception and interpretation in a rapidly-evolving event.  For example, baseball pitchers study films and live games to perceive the pattern of a particular player and predict how to best pitch the ball to that player in a critical game.  During a football game the opposing team's coaches and players look for offensive and defensive line formations to predict whether there will be a blitz, a fake, or an effort to sack the quarterback.  Medical professionals, firefighters, pilots, and others frequently use pattern recognition in time-compressed decision-making.[8]  Much of contemporary law enforcement training consists of teaching deputies to make recognition primed decisions.[9]  Firearms training and scenario-based training very often focus on preparing deputies to confront a dynamic and complex situation.  In the almost imperceptibly brief milliseconds available for decision-making in a critical incident, a deputy automatically processes perceived threats and possible responses.  The human brain shifts to recognition-primed decision making when faced with an urgent situation involving a substantial and urgent threat with little

---

[8]  S. Bond, *Modeling emergency decisions: recognition-primed decision making. The literature in relation to an ophthalmic critical incident*, Journal of Clinical Nursing V. 15, no. 8 (August 2006); R. Sinha, *Impact of Experience on Decision Making in Emergency Situation*, Lulea University of Technology (2005); B. Murray, *You Have to Be Mental to be a Fighter Pilot, Canadian Air Force Journal*, 45-46, V. 3, no. 4 (Fall 2010); L. Miller, *RPD on the Fireground*, American Fire Journal (Apr. 1996) 7-8.

[9]  Gary Klein, *Sources of Power-How People Make Decisions*, (MIT Press 1998).

or no time for contemplative decision making and when lacking detailed data (such as the certainty of identification of an object targeted at the deputy or about to be aimed toward the deputy) for linear processing.[10]  Scenarios and training events, as well as years of experience, create a bank of stored data useful in recognition-primed decision making when the deputy must identify threats and patterns of behavior under severe time compression.  A suspect standing erect can draw a handgun from his waistband, aim and fire the gun in an average of 25ms (a quarter-second).  Lewinski, B., *Why is the suspect shot in the back? Finally, hard data on how fast the suspect can be—in 11 different shooting scenarios*. The Police Marksman, 25(6), 20-28 (2000).  In contrast, a deputy anticipating a possible threat and holding his or her handgun in a high ready position (weapon held extended just below the deputy's line of sight) will raise and fire a single defensive round in average response time 83ms (83/100ths of one second).[11] Bushey, J., Dicks, N., Dysterheft, J., Lewinski, W., *Ambushes Leading Cause of Officer Fatalities – When Every Second Counts: Analysis of Officer Movement from Trained Ready Tactical Positions*. Law Enforcement Executive Forum. 15 (2015); Dysterheft, J., Hudson, W., Lewinski, W., *Police Officer Reaction Time to Start and Stop Shooting: The Influence of Decision-Making and Pattern Recognition*. Law Enforcement Executive Forum. 14 (2014).   In other words, "action beats reaction" both as a matter of physics and human performance. Contrasting the average time for a suspect to draw and fire (the suspect having

---

[10]  In contrast, when a deputy perceives a threat in circumstances that perceived to be subject to the deputy's control and there is no urgency, a deputy can engage in linear processing, seeking and weighing response options.

[11]  This average time was calculated with subject officers responding to unequivocal visual stimuli signaling a simulated threat in the simplest and clearest laboratory conditions where the officers were prepared, knowledgeable about the study, and held the firearms at the ready as they were fully prepared to react, without any external distracting stimuli.  Times in actual street encounters are certain to be greater that in the pristine laboratory conditions which posed no real threat to the test cohort members.

made the decision to act without showing any external cue that he was about to draw and fire) of 25ms, with the average time required for a deputy to discern that a potential threat is erupting and to fire a single defense round of 83ms, one perceives that a suspect can fire three rounds at a deputy before the deputy is able to initiate defensive fire (assuming that the suspect's rounds have not killed or incapacitated the deputy).

10.    None of the deputies could have been certain whether Cameron Ely had a gun, or another knife, or some other weapon at the moment he lunged forward and called out that he had a gun.  Notwithstanding, Deputies Farley and Gruttadaurio, Senior Deputy Rogers, and Sergeant Thome each observed a pattern in Cameron Ely's physical actions –further informed by the reasonable belief that Cameron Ely had stabbed, slashed and murdered Valerie Ely– as perfectly consistent with the deadly threatening initial stage of drawing and imminently firing a gun at the deputies.  Cameron Ely moved his hand toward his waistband as he exclaimed, "I have a gun."  Recognition-primed decision making involves rapid scanning of plausible options and selecting the first pattern match option.  A deputy observes cues and indicators that generate recognition of a pattern.[12]  The deputy considers alternative action scripts (mentally sorted according to typicality) in a scan through the deputy's neurological database of similar experiences, compares a particular action script to the situation presented in a mental simulation, and accepts and executes the first appropriate action script.  Recognition-primed decision making may be vernacularly explained as, "if it sounds like a duck, it's probably a duck."  Through training and job performance as a deputy becomes more experienced (whether by field experience or reality-based scenario training)

---

[12] *Perception, Cognition, and Decision Training: The Quiet Eye in Action*, J. Vickers, 2007.

the deputy builds the ability to choose the best action script.[13]  In circumstances such as those faced by Deputies Farley and Gruttadaurio, Senior Deputy Rogers, and Sergeant Thome, where each deputy perceived a very urgent and grave threat to his or her personal safety and the safety of the other deputies, a deputy is even more likely to reflexively employ recognition-primed decision making in choosing an urgent and instant response to the threat.  Deputies Farley and Gruttadaurio, Senior Deputy Rogers and Sergeant Thome each individually perceived that the gravity of the threat presented by Cameron Ely required an immediate, defensive deadly force response.  Presented with the facts and circumstances known and reasonably perceived by Deputies Farley and Deputy Gruttadaurio, Senior Deputy Rogers and Sergeant Thome, a reasonable and well-trained deputy would have responded with defensive, deadly force to Cameron Ely's actions.

11.     As he rose and lunged forward Cameron Ely was well within the area from which he could kill the deputies.  A well-trained and reasonable deputy would have realized that Cameron Ely was close enough to the deputies that immediate defensive force was necessary.  A well-trained and reasonable deputy would have perceived that Deputies Farley, Gruttadaurio, Senior Deputy Rogers, and Sergeant Thome were each at substantial risk of death or serious bodily injury at least by the moment that Cameron Ely rose up, shouting "I have a gun" while in very close proximity to each deputy.  A well-trained and reasonable deputy would have perceived that each of the partner deputies standing near him or her was also at substantial risk of death or serious bodily injury as Cameron Ely rose up shouting, "I have a gun" while in very close proximity to each deputy.  A well-trained and reasonable deputy would have recognized that using defensive deadly force to prevent Cameron Ely from drawing a gun and firing at the deputies, and/or

---

[13]  J.N. Vickers, W. Lewinski, *Performing under pressure: Gaze control, decision making and shooting performance of elite and rookie police officers*, Human Movement Science 31 (2012) 101–117.

striking the deputies with a club or other blunt weapon, and/or stabbing or slashing with a knife was entirely consistent with generally-accepted police training, tactics, and practice standards.

12.     Deputy Farley reported that he was "within 2 feet approximately" when he drew his handgun and fired "as I backed away from him."  Deputy Gruttadaurio testified that as he and Deputy Farley stood apart at 45 degree angles, he was approximately 8 to 10 feet away from Cameron Ely when he called out that he had a gun and moved his hand to his waist area.  Senior Deputy Rogers testified that he was just about "shoulder to shoulder" to Deputy Gruttadaurio and approximately 12 to 15 feet from Cameron Ely when Senior Deputy Rogers fired his gun.[14]  Sergeant Thome estimated that she was "no more than 15 feet" away when she fired her handgun at Cameron Ely.  The deputies were in a line with Deputy Farley on the left, then Sergeant Thome, Senior Deputy Rogers, and Deputy Gruttadaurio on the right.[15]  Each deputy was in a slightly different position with different angles to Cameron Ely and different distances from him.  Consequently, each deputy had a slightly different field of view.

13.     Multiple variables may affect a witness's perception, recall, and reporting of distances – such as the perception of Cameron Ely's movement toward his waist area as he exclaimed that he had a gun, or whether the witness saw a metallic or silver flash.  There was little illumination, only the hard and narrow beams of flashlights.  Among common external visual cues that may have impacted the witnesses' perception, recall, and reporting of distances are their perceptions of light and shadows, which give cues to distance, and relative motion.  The

---

[14]  Investigators recorded a slightly longer estimated distance of perhaps as much as 12-20 feet.

[15]  Sergeant Thome fired eight 9mm rounds from her handgun.  Senior Deputy Rogers fired four 9mm rounds from his handgun.  Deputy Farley fired three .40 rounds from his handgun.  Deputy Gruttadaurio fired nine 9mm rounds from his handgun.

limitations of the human ocular system generally, and the health and condition of
each witness's ocular system, also impact the witness's perception, recall, and
reporting.  For example, a witness who captures the event in peripheral vision will
have a markedly different perception than a witness or participant who is near and
whose vision is focally directed to the event.  Humans resolve less detail in their
peripheral field because they have more retinal photoreceptors (rods/cones)
towards the fovea.  A person's highest sensitivity to spatial detail is at the fovea
(the central two to three degrees of vision).  Approximately 80% of a person's
cortical cells are devoted to the central ten degrees of vision.  Humans can resolve
less spatial detail in objects moving across the retina, causing the objects to blur
as they move.  J.N. Vickers, *Perception, Cognition and Decision Training*,
Human Kinetics (2007) 18-32.  Each deputy's estimation of distance must be
considered in light of their angle of view, focus of attention, individual ocular
system limitations, obstacles, and available light.

14.     Struck by bullets, Cameron Ely fell to the ground.  When he fell, his right hand
        was under his body so that the deputies could not see his hand and could not see
        whether he had a gun or other weapon in or near his hand.

15.     Deputy Gruttadaurio stated: "He still had his hand underneath him.  It wasn't
        visible to me, and he was breathing and arching his back in an upward motion,
        and it looked like he was trying to still draw a weapon as he was lying down."
        Deputy Gruttadaurio can be heard on Deputy Farley's Coban audio recording
        telling the other deputies that "there's a gun is under him."[16]  Sergeant Thome saw

---

[16]  The Coban dash camera system features remote microphones worn by the patrol
deputies.  Deputy Farley and Senior Deputy Rogers had operational Coban recorders activated
during the initial entry into the house and throughout the encounter with Cameron Ely.  The
Coban microphones are standard wireless microphones intended to capture audio during a traffic
stop.  Like most dash camera systems, the wireless microphones have a very limited range and
are subject to interference and lost signals due to obstructions and buildings between the
receiving unit and the wireless microphone or loss of battery power.  The microphones are
programmed to repeatedly attempt to connect with the receiver when the signal is interrupted,
often resulting in static and incomplete audio capture.

an "unidentified silver object" near Cameron Ely's hand that she believed to be a threat to the deputies.  Deputy Gruttadaurio shouted several times at Cameron Ely to "remove your right hand from underneath your body, very slowly."  Cameron Ely did not respond to that command.  Sergeant Thome decided that "in order to [approach Cameron Ely] safely the fastest we could do it safely would be to bring up the shield" and approach with the ballistic cover of the shield.  Deputies are trained to make deliberate approaches to downed suspects from behind the cover of a ballistic shield and to use a pinning technique to contribute to the safety of a search and handcuffing.  Deputies are trained to use a ballistic shield to take the time and carefully approach to ensure that the suspect is no longer a threat before searching the suspect for weapons and securing the suspect.

16.    Deputy Brownlee obtained a ballistic shield from Sergeant Thome's patrol vehicle.  Deputy Brownlee then lead the deputies in a "stick" or a single file to Cameron Ely to search him for a gun or other weapons and handcuff him.  The deputies did not find a gun on or about his person.  Taking the time to obtain a ballistic shield was a reasonable precaution for the deputies' safety and to mitigate the potential for additional force should one of more of the deputies perceive a further threat from Cameron Ely.  Using a ballistic shield in this manner and these circumstances was consistent with generally accepted police training, tactics, and practice standards.

17.    The deputies secured and searched Cameron Ely.  They immediately called for the waiting paramedics to attend to him.  Santa Barbara County Fire Paramedics provided medical aid to Cameron Ely.  Directing the paramedics to wait in a safe place a very short distance away while the deputies ensured that Cameron Ely was searched for weapons and secured was a reasonable precaution and was consistent with generally accepted police training, tactics, and practice standards.

c.      **The training and supervision of the deputies was consistent with generally accepted**

**police training and practices.**

1.      Deputies Farley and Gruttadaurio, Senior Deputy Rogers, and Sergeant Thome,
were each certified as California Peace Officers by the California Commission on
Peace Officer Standards and Training.  Sergeant Thome received her Basic Peace
Officer Certificate in Feburary 2008 and her Advanced Peace Officer Certificate
in Feburary 2017.  The Advanced Peace Officer Certificate is awarded by the
California Commission on Peace Officer Standards and Training to deputies who
achieve certain specified training and education benchmarks and/or a college
degree and honorably complete a prescribed number of years of law enforcement
experience.   Senior Deputy Rogers received his Basic Peace Officer Certificate in
January 2007 and his Advanced Peace Officer Certificate in March 2013.   Deputy
Gruttadaurio received his Basic Peace Officer Certificate in October 2018.
Deputy Farley received his Basic Peace Officer Certificate in July 2007.

2.      I have reviewed the training records for Deputies Farley and Gruttadaurio, Senior
Deputy Rogers, and Sergeant Thome.  I am generally familiar with California
Peace Officer Standards and Training's approved Learning Domains and many of
the associated lesson plans used for police officer basic training in California
police academies.  Each of these deputies had not only successfully completed
basic police training and a substantial number of additional training courses as a
Santa Barbara County Sheriff's Deputy, but also completed regular in-service
training and weapons qualifications exercises.  Each deputy still employed by
SBSO[17] continues to maintain certification by the California Commission on
Peace Officer Standards and Training through compliance with annual required

---

[17]   Senior Deputy Rogers subsequently resigned from the SBSO to pursue other interests
in another state.

*Ely v. County of Santa Barbara, et al.*
*Report of Kenneth R. Wallentine*                        21

training.  The SBSO provides a robust in-service training program that exceeds national practices for police training.

3.     The California Commission on Peace Officer Standards and Training curriculum consists of training generally regarded by police accreditation agencies throughout the United States as being adequate and proper police training for an officer.  The California Commission on Peace Officer Standards and Training basic training program provides a curriculum that is substantially similar to programs offered throughout the nation and recognized as providing the essential pre-service training for law enforcement officers.  Each officer must complete a Basic Peace Officer Course with a minimum of 664 hours of POST-developed training and testing in 42 separate area Learning Domains.  Trainees must successfully complete all of the academy requirements and pass a comprehensive final examination to become certified as a California Peace Officer and eligible for continued employment with a California Sheriff's Officer or other police agency.

4.     This incident was scrutinized by a SBSO Use of Force Review Board, pursuant to SBSO Policy 302, Deadly Force Review.  Consistent with best practices for review of a critical incident, the reviewing authorities included senior command level staff and training staff.

2.     In reaching my opinions in this matter I have relied upon my training and experience in public safety acquired throughout my career.  A summary of my qualifications, publications, litigation history and fee schedule are recited herein.

3.     **My qualifications as an expert in this subject matter include the following:**  I am a law enforcement officer in the State of Utah.  I became certified as a law enforcement officer in the State of Utah in 1982.  I am the Chief of the West Jordan (Utah) Police Department, where I oversee all police operations and investigations.  I am the Chair of the Governing Board of the Officer-Involved Critical Incident Investigations Teams in Salt Lake County, Utah.  I was

*Ely v. County of Santa Barbara, et al.*
*Report of Kenneth R. Wallentine*                        22

formerly employed with the Utah Attorney General, where I served as the Chief of Law Enforcement.  After a period in private practice, I was as a Special Agent with the Utah Attorney General Investigation Division, where I coordinated a statewide use of force training initiative and coordinated officer-involved shooting investigations and other special investigations.  I also serve in a consultation role as Senior Legal Advisor for Lexipol, the nation's leading provider of law enforcement risk management resources.

I was formerly employed as a Bureau Chief at the Utah Department of Public Safety, Peace Officer Standards and Training Division, where I supervised investigations into allegations of improper and excessive force, officer integrity, and criminal acts alleged to have been committed by law enforcement officers and supervised in-service training administration and certification for all peace officers in the State of Utah.  I also supervised the police service dog training and certification program for the State of Utah.  I had responsibility for policy drafting and review for the parent agency, the Utah Department of Public Safety.

My duties included direct supervision and command of various investigative units and agents throughout the State of Utah, supervising law enforcement officers, forensic specialists, and technicians.  I commanded the State of Utah Child Abduction Response Team.  I commanded the State of Utah Officer-Involved Fatality Investigation Team.  I am a member of the Board of Review of the Utah Technical Assistance Program, consulting in cold case homicide and complex violent person crimes investigations.  In 2010, Governor Herbert selected me for the Governor's Leadership in Public Service award for my work in public safety leadership.

4.      I currently serve on the Use of Force Standards and the K9 Standards Committees of the Utah Peace Officer Training and Standards Division, articulating the standards for use of force by police officers and deployment of police service dogs.  I was formerly responsible for providing delivery of the Basic Training Curriculum related to all legal subjects, as well as certain tactical subjects, at the Utah Law Enforcement Academy.  I continue to teach at the Utah Law Enforcement Academy.  I am the author of the police academy curriculum currently in use for several subjects, including, but not limited to, use of force, reasonable force, use of force and

police service dog teams, search and seizure, search and seizure for police service dog teams, and use of force/firearms instructor liability.  I am a certified POST Firearms Instructor, and often served as the lead instructor for POST Firearms courses.  I am certified by the Force Science Research Center as a Force Science Analyst® and an Advanced Force Science Specialist®.  I am a former certified TASER® Instructor.  I am a certified Excited Delirium and Sudden Death Investigation Instructor.  I was certified by the Los Angeles Police Department in Officer-Involved Shooting Investigation.  In 2011, I was certified by the Institute for the Prevention of Sudden In-Custody Death as an instructor in restraint systems.

5.      I am a licensed attorney, having practiced law since 1990.  I am admitted to practice before the United States Supreme Court, the Courts of Appeals for the Fifth and Tenth Circuits, and the State and Federal courts in the State of Utah.  I am a Master of the Bench of the American Inns of Court, Inn One, where I also serve as the past-President of the Inn of Court.  I serve as an Administrative Law Judge for the State of Utah and for various counties and cities in Utah, providing hearing officer and appellate hearing services for hearings involving allegations of police officer misconduct for a variety of state agencies and municipalities.  I was formerly on the faculty of Excelsior College, teaching Criminal Procedure, Evidence and Management Strategies for Public Safety.

6.      In addition to my primary employment, I occasionally consult and provide expert witness opinions on police procedures, and use of force issues.  I occasionally perform in-custody death investigations and officer-involved shooting death investigations for agencies which may lack the requisite expertise.  I am a consultant to the Utah Risk Management Mutual Association, the state's largest insurer of public safety agencies, on matters of officer conduct and discipline, hiring and screening practices, use of force, and police pursuit policies.  I am the co-founder of a best practices advisory group that developed comprehensive model policies and best practices under the authority of the Utah Chiefs of Police Association, the Utah Sheriffs' Association and various state law enforcement agencies.  These policies serve as a model for all Utah public safety agencies.  I am the author of a number of model policies for law enforcement agencies,

and have provided policy drafting and policy review services for several agencies, including policy drafting responsibility for large law enforcement agencies.  I have served as a contract consultant to the United States Department of Justice, assigned to provide technical assistance and management consulting to various public safety entities in the United States.

7.      I participate and serve in a number of community and professional capacities. Professional activities pertinent to law enforcement include serving as the president of the Utah Chiefs of Police Association.  I represent the Utah Chiefs of Police Association on the League of Cities and Towns Listen, Love, Learn Task Force, creating strategies for police reform and relations with communities of color.  I am a founding member of First Steps to More Trust, an initiative to join young persons in the BIPOC community with young public safety professionals in leadership training and community engagement.  I am the Chair of the Governing Board of the Officer-Involved Critical Incident Investigations Teams in Salt Lake County, Utah, and have direct command of  Officer-Involved Critical Incident Investigations Team IV.  I am Vice-Chair of the Salt Lake County Law Enforcement Administrators and Directors Association.  I am a member of the Board of Directors of the Institute for the Prevention of Sudden In-Custody Death, member of the Board of Advisors, Association of Force Investigations, member of the International Association of Chiefs of Police and the Utah Chiefs of Police Association, member of the National Tactical Officers Association, former member of the International Association of Law Enforcement Firearms Instructors, member of the United States Police Canine Association, former member of the Board of Directors of Crisis Intervention Team Utah, Past-President of the Utah Peace Officers Association, former Board Member of the Utah SWAT Association, past member of the board of directors of the NAACP, Salt Lake City branch, and board member of the Utah Law Enforcement Legislative Committee.  I formerly served as a gubernatorial appointee to the Council on Peace Officer Standards and Training.  I am a former member of the Scientific Working Group on Dog and Orthogonal Detector Guidelines, a national scientific best practices organization sponsored by the Federal Bureau of Investigation, the Department of Homeland Security, and the Transportation Security Administration, with support coordinated by

the International Forensic Research Institute at Florida International University.  I have been a presenter at a variety of professional conferences and seminars, including presenting on use of force training at the annual convention of the International Association of Chiefs of Police and the International Conference of the Institute for the Prevention of Sudden In-Custody Death.

8.      From 1994 to 2014, I was a consultant with the K9 Academy for Law Enforcement and the International Police Canine Conference.  My principal responsibilities included providing use of force training, civil liability instruction, and search and seizure instruction.  I have provided police service dog training and certification standards consultation for two police service dog organizations, including a western regional group and one of the major national groups.  I serve as a consultant for the California Narcotic and Explosive Canine Association and have been a featured lecturer at their annual training conference over the past decade.

9.      I am a Senior Legal Advisor for Lexipol.  In that capacity, I have assisted in the drafting and review of use of force and other policies in current use by more than 3,300 public safety agencies in the United States.

10.     **My publications (limited to ten years) include the following:**  I have previously published a number of other professional articles, many of which have been subjected to peer review.  My most recent book, *Preparing for an Active Shooter Threat*, was published in June 2020 by Blue360 Media.  Another book, *Street Legal: A Guide to Pre-trial Criminal Procedure for Police, Prosecutors, and Defenders*, 2nd edition, was published in 2020 by the American Bar Association Publishing Division.  *The K9 Officer's Legal Handbook*, 3rd ed., was published in February 2019.  My other published works include:  *Mitigating Suicide Threat Response Risks*, Police Chief, V. 86, No. 3 (2019); *Avoiding a Peer Support Pitfall*, Police Chief, V. 85, No. 3 (2018); *Should I Stay or Should I Go?*, POLICE, October 2017, *Hill v. Miracle: Adapting the Graham Standard to Non-Criminal Interventions*, Police Chief (August 2017): 18–19; *Armstrong v. Village of Pinehurst: Training and Policy Implications for Police*, Police Chief, V. 83, No. 6 (2016); *Supreme Court Decision Casts Doubt on Hotel Registry Ordinances*, Police Chief, V. 81, No. 10 (2015); *Body Worn Cameras: Plan Before Your Office Buys In*, The Sheriff

(June 2015); *Legal Risks of Failing to Care for Children of Arrested Persons*, Police Chief, V.
81, No. 10 (2014);  *A Rational Foundation for Use of Force Policy, Training and Assessment*,
2014 (2) AELE Mo. L. J. 101; *Post Incident Video Review*, Police Chief, V. 68, No. 12 (2011);
*Cell Site Location Evidence: A New Frontier in Cyber-Investigation*, 2011 (2) AELE Mo. L. J.
501, *Prospects, Pitfalls and Pains of Social Media and Public Safety*, The Municipal Lawyer,
September 2010; *Police Department May Read Text Messages Sent on Agency-issued Pagers:
City of Ontario, California v. Quon*, Police Chief, V. 57, No. 8 (2010); *Collection of DNA Upon
Arrest: Expanding Investigative Frontiers*, Police Chief, V. 57, No. 1 (2010); *Targeting TASER:
The New TASER Aim Points,* Law Officer, January 2010.

11.     **My fee schedule is established as follows:** I charge $275.00 per hour for examination of
reports and documents, site visits, interviews, administrative tribunal, deposition or court
testimony, with a minimum of $1,100.00 for deposition or court testimony.  I bill for actual travel
expenses and a travel fee of $1,100.00 per day/part-day for travel to western states and $1,500.00
per day/part-day outside western states.

12.     **My prior experience as an expert witness (limited to the past four years) includes
the following cases:**  I have been qualified as an expert in the subject matter of police
procedures, including use of TASER® devices, police use of force, shootings and wrongful death
claims, search and seizure, police service dog use, both in drug detection and dog bites, and I
have never had a court decline to find that I am a qualified expert witness.  I have testified and/or
provided depositions and trial testimony in the following cases which may be generally related to
the subject of the instant litigation in the past four years: *Khalaj & Youmarin v. City of Phoenix,
et al.*, CV-17-01199-PHX-GMS, United States District Court for the District of Arizona, 2021.
Deposition testimony given on behalf of defendants.  Subject matter: wrongful detention.
*Gomez-Guerrero v. Villafuerte*, No. 20 L 70, 19th Judicial Circuit Court, Lake County, Illinois.
Deposition testimony given on behalf of defendants.  Subject matter: wrongful death.  *Bueno v.
Howard, et al.*, No. 2:16-cv-03450- DGC-JZB, United States District Court for the District of
Arizona, 2021.  Trial testimony given on behalf of defendants.  Subject matter: police use of

force. *Lane v. City of Mesa*, No. 2:19-cv-00852-DJH, United States District Court for the District of Arizona, 2021. Deposition testimony given on behalf of defendant. Subject matter: wrongful death. *Mitchell v. City of Cedar Rapids*, No. LACV087209, Iowa District Court for Linn County, 2021. Deposition testimony given on behalf of defendant. Subject matter: wrongful death. *Johnson v. City of Mesa*, No. 2:19-CV-02827-JAT-JZB, United States District Court for the District of Arizona, 2020. Deposition testimony given on behalf of defendant. Subject matter: police use of force. *Ortega v. United States of America*, No. CV-19-08110-PCT-JAT, United States District Court for the District of Arizona, 2020. Deposition testimony given on behalf of defendant. Subject matter: police custody. *Peralta v. Arizona Department of Public Safety*, No. CV-17-01868-DJH-BSB, United States District Court for the District of Arizona, 2020. Trial testimony given on behalf of defendant. Subject matter: police custody. *Krakana & Zinn v. City of Scottsdale*, No. CV-17-01813-PHX-JJT, United States District Court for the District of Arizona, 2020. Trial testimony given on behalf of defendant. Subject matter: police tactical operation. *A.C. v. County of Santa Barbara*, No. 2:18-CV-3694 SK, United States District Court for the Central District of California, 2019. Deposition testimony given on behalf of defendant. Subject matter: police use of force. *Smith v. City of Waterloo*, Case No. LACV133172, District Court for Black Hawk County, Iowa, 2019. Trial testimony given on behalf of defendants. Subject matter: emergency vehicle operation. *Mould v. City of Tempe*, No. CV2016-018161, United States District Court for the District of Arizona, 2019. Trial and deposition testimony given on behalf of defendant. Subject matter: wrongful death. *Castro v. State of Arizona*, Case No. 2:18-cv-00753-SRB, United States District Court for the District of Arizona, 2019. Deposition testimony given on behalf of defendants. Subject matter: police use of force. *Lawrence v. Las Vegas Metro Police Department*, No. 2:16-cv-03039-JCM-NJK, United States District Court for the District of Nevada, 2019, Deposition testimony given on behalf of defendants. Subject matter: wrongful death. *Webb v. City of Waterloo*, No. 6:17-cv-2001-CJW-MAR, United States District Court for the Northern District of Iowa. Deposition testimony given on behalf of defendants. Subject matter: police use

of force. *Charboneneau v. Demings*, No. 2017-CA-010862-O, Ninth Judicial District Court, Orange County, Florida, 2019. Hearing testimony given on behalf of defendants. Subject matter: use of force. *Carsons v. Black Bear Reserve Homeowners Association, Inc., et al.*, No. 35-2015-CA-001910, Fifth Judicial District Court, Lake County, Florida, 2018. Deposition testimony given on behalf of defendants. Subject matter: investigative procedures. *Mould v. City of Tempe*, No. CV2016-018161, United States District Court for the District of Arizona, 2018. Deposition testimony given on behalf of defendant. Subject matter: wrongful death. *McSwain v. United States*, No. 2:15-cv-01321, United States District Court for the District of Nevada, 2018. Trial testimony given on behalf of defendant. Subject matter: negligence. *Rodriguez v. City of West Covina*, No. 2:17-CV-0138 CBM, United States District Court for the Central District of California, 2018. Deposition testimony given on behalf of defendant. Subject matter: police canines. *Mims v. City of Charlotte*, No. 2014-CVS-23815, Superior Court of North Carolina, 2018. Trial and deposition testimony given on behalf of the defendants. Subject matter: wrongful death. *Chastang v. Levy*, No. 6:17-ev-00538-0r1-37 DCI, United States District Court for the Middle District of Florida, 2018. Deposition testimony given on behalf of defendant. Subject matter: police defensive deadly force. *Johnson v. Peay*, No. 160700949, Second District Court, State of Utah, 2017. Trial testimony given on behalf of defendant. Subject matter: police force to effect arrest. *Brunette v. Burlington*, No. 2:15-cv-61, United States District Court for the District of Vermont, 2017. Deposition testimony given on behalf of defendant. Subject matter: wrongful death. *Landon v. City of North Port*, No. 8:15-cv-02272-CEH-JSS, United States District Court for the Middle District of Florida, 2017. Deposition testimony given on behalf of defendant. Subject matter: police force to effect arrest. *Christiansen v. West Valley City, et al.*, No. 2:14-cv-00025, United States District Court for the District of Utah, 2016. Trial testimony given on behalf of defendants. Subject matter: police force to effect arrest. *State v. Barney*, No. 161300117, Fourth District Court, State of Utah, 2016. Trial testimony given on behalf of the prosecution. Subject matter: use of force. *United*

*States v. Jereb*, No. 2:15-mj-00356, United States District Court for Utah, 2016.  Trial testimony given on behalf of the prosecution.  Subject matter: use of an electronic control device.

The observations and opinions stated herein are preliminary, insofar as additional information may be provided to me through the course of discovery and other incidents of the litigation process.  They are based on the best information presently known to me.  I have assumed the general accuracy of the documents, statements, and reports, excepting those expressed as opinions and those conflicting one with another and/or conflicting with physical evidence, that were provided to me.  The opinions herein may be supplemented and/or revised upon receipt of additional information, including, but not limited to, further deposition testimony, consideration of any report submitted by plaintiff's experts, further investigation and/or further witness interviews.  I may supplement this report upon completion of depositions of witnesses in this matter and/or upon being provided with other investigative documents, and/or diagrams, video and photographs.

My trial testimony may be supported by exhibits that include the pleadings, documents, statements, depositions, diagrams, photographs, and reports listed herein, as well as illustrative evidence such as a visual presentation of computer-generated slides and visual images projected onto a screen, charts, graphs, or illustrations created to better illustrate the aforementioned documents.

CONCLUSION

The events begun by Cameron Ely's murder of his mother on October 15, 2019, indisputably brought great tragedy to Plaintiff and his family.  The deputies were faced with a horrific scene as they assisted Plaintiff, began their investigation, and were confronted with Cameron Ely as he shouted, "I have a gun" and lunged at the deputies like a football quarterback. The Santa Barbara County Sheriff's deputies' response to the disturbance call at Plaintiff's residence was consistent with generally accepted police training and practices.  The deputies' response to Cameron Ely as they suddenly encountered him at the murder scene was reasonable

and was consistent with generally accepted police policies, practices, and training.  The training
and supervision of the deputies was consistent with generally accepted police training and
practices.


Kenneth R. Wallentine
July 14, 2021